# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

LISA A. LINDAMOOD                    :
                                          Case No. 3:07-cv-00200
            Plaintiff,

     -vs-
                                     District Judge Walter H. Rice
MICHAEL J. ASTRUE,                   Chief Magistrate Judge Michael R. Merz
Commissioner of Social Security,

            Defendant.               :

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict

(now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged

2

in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on October 15, 2001, alleging disability beginning October 1, 2001, due to headaches, limited neck mobility, fibromyalgia, tachycardia, and tremors. (Tr. 103). Plaintiff's application was denied initially and on reconsideration. (Tr. 44-47; 49-51). A hearing and a supplemental hearing were held before Administrative Law Judge Melvin Padilla, (Tr. 864-99; 900-24), who determined that Plaintiff is not disabled. (Tr. 14-37). The Appeals Counsel denied Plaintiff's request for review, (Tr. 6-8), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff met the insured status requirement of the Act through December, 2004. (Tr. 35, finding 1). Judge Padilla also found that Plaintiff has severe transformed migraine headache from analgesic overuse, generalized body arthralgias of unknown etiology, anxiety with some panic attacks,

3

depression/dysthymia, and lumbar and cervical degenerative disc disease, but that she does not have an impairment or combination of impairments that meets or equals the Listings. *Id.*, finding 3. Judge Padilla found further that Plaintiff has the residual functional capacity to perform a range of sedentary work if she is allowed to alternate positions as necessary, is restricted from repetitive twisting, is limited to inside work in a temperature controlled environment, and is restricted from the use of vibratory tools, from work on ladders, scaffolds, at unprotected heights, in hazardous areas, and in areas of exposure to wetness. *Id.,* finding 4. Judge Padilla additionally found that Plaintiff is limited to low stress jobs, not dealing with the public, with no fast-paced work, no production quotas, and minimal contact with supervisors and co-workers, and restricted from jobs involving teamwork. *Id*. Judge Padilla found further that Plaintiff is unable to perform her past relevant work as a massage therapist and administrative assistant. (Tr. 36, finding 6). Judge Padilla then used sections 201.07 through 201.29 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 36, findings 11 and 12). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 36, finding 13).

Plaintiff began treating with Dr. Whitmer in 1997. (Tr. 144-75). Palintiff's primary complaints were chronic low back pain and migraine headaches. *Id.* On August 4, 1999, Plaintiff had an MRI of the left knee which showed a small joint effusion, an abnormal anterior cruciate ligament, and some degenerative changes. (Tr. 668). An August 10, 1999, MRI of Plaintiff's lumbar spine revealed mild degenerative disc disease with minimally diffuse bulging discs at L5-S1 level. (Tr. 667).

4

Plaintiff consulted with neurologist Dr. Wamsley in November, 1999, for complaints of headaches. (Tr. 176-99).  Dr. Wamsley noted that Plaintiff's neurological examination was essentially normal. *Id.* Over time, Dr. Wamsley continued to report that Plaintiff's examination was normal and he was unable to identify the cause of Plaintiff's headaches. *Id.*

Plaintiff consulted with cardiologist Dr. Sinnathamby during the period March 29, to December 10, 2001. (Tr. 200-34).  Dr. Sinnathamby noted that Plaintiff had a history of mitral valve prolapse, palpitations, and headaches, and that she complained of fatigue. *Id.*  Dr. Sinnathamby also noted that Plaintiff had a mild systolic click, but that her physical examination was otherwise within normal limits. *Id.*  An echocardiogram performed on December 10, 2001, indicated that Plaintiff had mild mitral and mild tricuspid regurgitation, mild left ventricular hypertrophy, and thickening of the right ventricular free wall consistent with hypertrophy. *Id.* Also on December 10, 2001, Dr. Sinnathamby reported that Plaintiff complained of chest discomfort associated with dyspnea, that her extremities had a trace amount of edema, and that he doubted that Plaintiff's symptoms were due to coronary artery disease. *Id.*

On September 11, 2001, Dr. Whitmer noted that Plaintiff  complained of  having headaches that resulted in visual disturbances and numbness of the face, tongue, and lips. (Tr. 144-175).  Dr. Whitmer also noted that Plaintiff's chronic headaches had become a "significant detriment to her life" and he prescribed, *inter alia,* Oxycontin.  *Id.*

Plaintiff presented to the ER for complaints of  headaches on September 14, 2001, and October 22, 2001. (Tr. 236-37; 254-55). Plaintiff was treated and released on both occasions. *Id.*

On November 8, 2001, a MRI of Plaintiff's lumbar spine showed multilevel degenerative disc disease with some asymmetric bulging at L4-5 and a mildly bulging disc at L5-S1. (Tr. 661-62).

On January 2, 2002, examining physician, Dr. Danopulos reported that Plaintiff had four major complaints including headaches, unsteady gait due to a brain problem with aches and pain all over her body with tremors, neck pain, and palpitations with mitral valve prolapse. (Tr.256-266). Dr. Danopulos also reported that Plaintiff had intentional tremors in both hands, positive bilateral straight leg raising, restricted and painful lumbosacral spine motions, and painful cervical spine motions and he noted that Plaintiff's neurological examination was normal. *Id.* Dr. Danopulos opined that Plaintiff's objective findings were severe tension headaches, aches and pains all over her body resembling fibromyalgia, neck pain with exaggerated restricted motions and pain not fitting the diagnosis of torticollis or encephalitis, a clinical impression of severe anxiety neurosis but rule out schizophrenia and/or conversion. *Id.*

On January 25, 2002, Dr. Cohen of the Cleveland Clinic evaluated Plaintiff to rule out multiple sclerosis. (Tr. 269-73). Dr. Cohen noted that Plaintiff had normal motor tone, an intermittent irregular tremor on holding her arms extended, hyperactive deep tendon reflexes, and a slow, antalgic gait. *Id.* Dr. Cohen determined that multiple sclerosis was unlikely, and that Plaintiff's symptoms were consistent with fibromyalgia/chronic fatigue syndrome. *Id.*

On February 2, 2002, Plaintiff was seen in the ER for a severe headache with nausea. (Tr. 251). Plaintiff was treated, advised to follow up with her family doctor, and released. *Id.*

On March 6, 2002, Plaintiff was evaluated by Dr. Rozen in the headache clinic of the Cleveland Clinic. (Tr. 278-80). Dr. Rozen noted that Plaintiff complained of auras of squiggly lines

in her left eye. *Id.*  Dr. Rozen also noted that Plaintiff had a history of longstanding analgesic overuse which progressed from Tylenol and Aleve to Vicodin to OxyContin and to her current use of Darvocet and Duragesic. *Id.*  Dr. Rozen reported that his examination of Plaintiff revealed severely decreased neck motion with evidence of bilateral occipital nerve trigger points, neck and shoulder trigger points, normal motor strength, and diffuse hyper-reflexia with deep tendon reflex testing. *Id.*  Dr. Rozen also reported that his impression was chronic headache most suggestive of transformed migraine from analgesic overuse and fibromyalgia and he recommended Plaintiff go to inpatient headache management.   *Id.*  Dr. Rozen also recommended that Plaintiff attend the Michigan Head Pain and Neurological Institute ("MHNI") for detoxification. (Tr. 280).

Plaintiff consulted with Dr. Mandell, a rheumatologist at the Cleveland Clinic, on April 2, 2002. (Tr. 248-49). Dr. Mandell noted that, based on her history, Plaintiff fit the diagnosis of fibromyalgia and he opined that such a diagnosis was supported by the presence of multiple tender points. *Id.* Dr. Mandell urged the Plaintiff to begin a progressive aerobic exercise program and recommended that she participate in a pain program. *Id.*

On April 25, 2002, reviewing physician, Dr. Drew opined that there was no evidence of a severe physical impairment. (Tr. 289-90).  Dr. Drew noted that there was evidence of symptoms related to chronic narcotic use including rebound headache and muscle aches/pains.  *Id.*  Dr. Drew also noted that there was evidence of chronic sedative use which included tremors which she (Dr. Drew) opined were a common finding when sedatives "wear off" when they are used on a chronic basis. *Id.*  Dr. Drew opined that Plaintiff appeared to be "trying to look worse than she is".  *Id.*

On June 19, 2002, Plaintiff was evaluated by Dr. Alicia Prestegaard at MHNI.  (Tr. 311-14.)  Dr. Prestegaard noted that  Plaintiff reported a history of headaches since 1991 and that

she stopped working in 1999 due to her headaches. *Id.* Dr. Prestegaard noted that narcotics appeared ineffective for Plaintiff's chronic daily pain, that Plaintiff appeared to be in significant discomfort due to pain, and that there was evidence of significant muscle spasm in the posterior neck and shoulder. *Id.* Dr. Prestegaard reported that Plaintiff had normal muscle tone, strength, bulk, and sensation, her gait was antalgic and unsteady, and that she could walk without the assistance of a cane in the office, but that she (Plaintiff) reported that she usually used one. *Id.* Dr. Pestegaard also reported that Plaintiff's cervical range of motion was limited and that Plaintiff had tenderness to palpation all over the body. *Id.* Dr. Prestegaard stated that it was impossible to distinguish tender points of fibromyalgia as Plaintiff was tender any place that she was touched. *Id.* Dr. Prestegaard noted that her assessment of Plaintiff included chronic daily headaches, migraine varient with possible cervicogenic component which were intractable, analgesic rebound headaches, chronic pain syndrome with generalized body pain not clearly fulfilling the criteria for fibromyalgia, abnormal neurological examination with hyperrefelxia and significant limitation of range of motion in the neck possibly related to a severe C-spine spondylosis, dependence on opioids for treatment of her chronic pain condition, and psychological factors affecting a chronic pain condition with depression and anxiety. *Id.* Dr. Prestegaard opined that it was medically necessary to admit the Plaintiff to the Head-Pain Treatment Unit for inpatient treatment for withdrawal from narcotics and to develop a new non-opioid prophylactic pain program. *Id.*

Plaintiff was hospitalized June 20-July 19, 2002, for treatment of intractable headaches. (Tr. 291-354; 355-413). At the time Plaintiff was admitted to the hospital, Dr. Prestegaard noted that Plaintiff had an unsteady and antalgic gait, generalized muscle tenderness all over her body, tenderness over typical fibromyalgia points, a significantly limited cervical spine

range of motion, increased muscle spasm in the posterior neck muscles, occipitocervical junction, and shoulders, and that she had tenderness and clicks on the tempromandibular joints. *Id.* During that hospitalization, Plaintiff exhibited chronic pain behaviors, became more functional over time, had, *inter alia,* a cervical facet block, was treated with medications, and participated in the head-pain program. *Id.*

Also during that hospitalization, consulting psychologist Dr. Pingel reported that Plaintiff's primary complaint was constant moderately severe to severe head pain, unresponsive to outpatient and inpatient treatment including long-acting opioid medication. *Id.* Dr. Pingel also reported that Plaintiff ambulated with a cane and indicated that she had no energy. *Id.* Dr. Pingel noted that Plaintiff's responses to the Beck Depression Inventory indicated that Plaintiff was more anxious and tense than she was depressed. *Id.* Dr. Pingel identified Plaintiff's diagnoses as panic disorder with agoraphobia, a pain disorder associated with both psychological factors and a general medical condition, opioid dependence, and personality disorder, not otherwise specified. *Id.*

On August 1, 2002, reviewing psychologist, Dr. Semmelman reported that Plaintiff had a generalized anxiety disorder with panic attacks and mild agoraphobia and a pain disorder associated with medical conditions. (Tr. 414-31). Dr. Semmelman also reported that Plaintiff was irritable but got along well with her husband and family. *Id.* Dr. Semmelman noted that Plaintiff's anxiety appeared mild to moderate, and that she was, at worst, only mildly agoraphobic. *Id.* Dr. Semmelman noted that Plaintiff's social skills were mildly to moderately impaired, she was able to relate appropriately in non-public and smaller group settings, was able to understand and follow simple and more detailed oral and written directions, and that she would do better with tasks which do not require strict time lines or productivity standards. *Id.*

On August 12, 2002, Plaintiff was re-evaluated by Dr. Taylor at MHNI. (Tr. 292-93). Dr. Taylor noted that Plaintiff reported that her headaches had improved, she had immediate relief from Botox injections, and that it was unclear what might have contributed to this immediate relief as Botox typically takes several weeks to be effective. *Id.* Dr. Taylor also noted that Plaintiff was attending physical therapy, that she requested that her family physician direct her care, and that she would return to MHNI on an intermittent basis. *Id.*

On September 19, 2002, Plaintiff was sought treatment in the emergency room for a complaint of headaches. (Tr. 455-56). Plaintiff was treated with Toradol, Ultram, and Phenergan, and told to follow up with her primary doctor. *Id.*

On September 27, 2002, Plaintiff was evaluated by Dr. Petty, a physiatrist, for her low back pain. (Tr. 457-60). Dr. Petty noted that Plaintiff had palpable tenderness of the bilateral lumbar region with limited range of motion bilaterally and that a lower extremity EMG was normal. *Id.* Dr. Petty opined that Plaintiff was symptomatic for mild midline disc protrusion associated with diffuse, bilateral muscular low back pain and he recommended physical therapy. *Id.*

On October 2, 2002, Plaintiff consulted with Dr. Mays at the Cleveland Clinic Department of Neurology. (Tr. 432-34). Dr. Mays noted that Plaintiff had been admitted at MHNI for treatment of her headaches, that she was diagnosed with opiate-induced hyperalgesia, that Plaintiff reported that at the time she was admitted, she could barely move and was in a wheelchair, and that she believed that she was 50-60% better since being discharged. *Id.* Dr. Mays also noted that Plaintiff's husband thought that she was 80-90% better. *Id.* Dr. Mays noted further that Plaintiff had undergone bilateral facet blocks, which increased her neck motion, that she also noted significant fibromyalgia, and that the Botox injection decreased her headache pain. *Id.* Dr. Mays

reported that Plaintiff had mild limitation of motion in her neck and tenderness in the suboccipital, cervical paraspinals, and upper trapezius, and that she had normal motor and sensory examinations. *Id.* Dr. Mays administered a Botox injection for prevention of migraine headaches and Plaintiff noted immediate pain relief. *Id.* Dr. Mays continued to treat Plaintiff's intractable migraines. (Tr. 528-31, 537-39, 554-56, 672-96, 755-80, 816-22.)

On October 23, 2002, Dr. Welches of the Cleveland Clinic Pain Management Center evaluated Plaintiff for her low back pain. (Tr. 439-443). Dr. Welches reported that Plaintiff had moderate pain to palpation in the low back and the sacroiliac joints. *Id.* Dr. Welches administered trigger point injections and osteopathic manipulative therapy, and he encouraged Plaintiff to participate in physical and aquatic therapy. *Id.* In addition, Plaintiff underwent caudal epidural injections on February 25, 2003; April 1, 2003; and May 8, 2003. (Tr. 545, 548, 540, 534).

Dr. Mays reported on January 6, 2003, that she had been treating Plaintiff since October, 2002, that Plaintiff was able to lift/carry no weight, stand/walk for ½ hour in an 8-hour day and for less than 1/4 hour without interruption, sit for 2 hours in an 8-hour day and for ½ hour without interruption, that she had slurred speech due to medications, decreased balance, that her pain limited her ability to perform work-related activities for prolonged periods of time, and that she was not able to perform either light or sedentary work. (Tr. 679-92). Dr. Mays opined that Plaintiff was "one of the worse cases of headache and chronic pain" she had ever seen and that her prognosis for improvement was extremely poor. *Id.* Dr. Mays also opined that Plaintiff's diagnoses were lumbosacral radiculopathy, cervicoalgia, fibromyalgia, anxiety and depression, and pain at multiple sites and that she was not able to perform most work-related mental activities. *Id.*

Treating physician Dr. Whitmer reported on March 27, 2003, that he had been

treating Plaintiff since July, 1997, had last seen her on October 10, 2002, and that her diagnoses were severe fibromyalgia, migraine headaches, opioid induced hyperalgesia headaches, chronic low back pain, panic and depressive disorders, inhalant allergies, mitral valve prolapse, gastroesophageal reflux, and hyperlipidemia.  (Tr. 631-36). Dr. Whitmer also reported that, based on all the evidence as well as multiple medical consultations, it was "obvious" that Plaintiff had chronic pain syndrome, and that she had  been treated for associated anxiety and depressive symptoms. *Id.* Dr. Whitmer opined that Plaintiff would not be able to be prompt and regular in attendance, respond appropriately to supervision, co-workers, and customary work pressures, withstand pressure of meeting normal standards of work productivity, sustain attention and concentration to meet normal standards of work productivity and accuracy, demonstrate reliability, concentrate for two hour segments, perform activities within a schedule, or complete a normal work day or work week without interruption from psychologically and/or physically based symptoms. *Id.*

Also on March 27, 2003,  Dr. Whitmer  opined that Plaintiff was totally and likely permanently disabled from any type of meaningful employment, that it was difficult for her to function in any capacity around the house as far as performing any routine household chores, child-care and other social or functional duties or obligations, and that while her prognosis was extremely poor, she might experience periods of improvement alternating with periods of exacerbations. *Id.* Dr. Whitmer also opined that Plaintiff was not likely to return to any type of meaningful or gainful employment for the foreseeable future. *Id.*

From April 29, 2003 through August 18, 2003 Plaintiff received chiropractic adjustments from Dr. Derek Black. (Tr. 584-98).

Dr. Mays noted on July 1, 2003, that Plaintiff reported that she could go four days without having a severe headache, but then she could have a bad headache that lasted for a week and that if she treated it effectively, it could last less than half an hour. (Tr. 528-29).

July 29, 2003, x-rays of Plaintiff's lumbar spine showed mild disc space narrowing at  L4-5 and L5-S1, minimal end-plate spurring at the lumbosacral junction and no evidence of lumbar compression fracture. (Tr. 622).

On August 1, 2003, treating psychologist Dr. Clark reported that Plaintiff had been treating with a psychiatrist,  that additionally, she had been attending counseling sessions with her (Dr. Clark) since October 2002,  had attended 20 cognitive therapy sessions aimed at reducing feelings of guilt about being a burden to her husband, and that her Beck Depression Inventory scores remained mostly in the lower portion of the severe range, with occasional scores in the moderate range. (Tr. 572-73).

On August 28, 2003, Plaintiff consulted with Dr. Amongero, an orthopedic specialist, for low back and neck pain.  (Tr. 599-600).  Dr. Amongero reported that Plaintiff had a normal gait and mild paraspinal tenderness. *Id*.  Dr. Amongero recommended that Plaintiff continue with her current treatments and he noted that he did not have anything additional to offer her.  *Id.*

A pulmonary function study performed September 2, 2003, revealed mild restriction. (Tr. 621).

On September 5, 2003 Plaintiff consulted with cardiologist Dr. Hymon for mitral valve prolapse syndrome. (Tr. 601-02). Dr. Hymon noted that Plaintiff arrived in a wheelchair and said that she had problems walking, but he (Dr. Hymon) noted that Plaintiff was able to move from the exam table to a chair without difficulty. *Id.*  Dr. Hymon essentially reported that Plaintiff's

physical examination was normal. *Id.* Dr. Hymon recommended that Plaintiff continue with counseling and that she lose weight, and exercise. *Id.*

On December 1, 2003 Plaintiff underwent a sleep study which revealed that Plaintiff had a moderate obstructive sleep apnea. (Tr. 806).

On December 30, 2003 Dr. Mays reported that Plaintiff's depression and anxiety did not allow her to cope with her pain, medication used to treat her pain impaired her cognition, and that due to pain, Plaintiff would have multiple absences from work. (Tr. 684-92). Dr. Mays also reported that Plaintiff could not be relied on to take on new tasks/duties without it causing a crisis, she could not withstand the pressure of meeting normal standards of work productivity, she could not even manage household duties, and that she had poor attention and comprehension. *Id.* Dr. Mays opined that Plaintiff could concentrate for probably less than a half-hour, that she would likely miss one to two days of work per week, that her pain had produced significant psychological effect with regard to depression along with impaired cognition and attention, and that pain would greatly interfere with Plaintiff's ability to perform the mental demands of work on a regular and continuing basis. *Id.*

On January 6, 2004, Dr. Mays reported that she had been treating Plaintiff for intractable headaches since 2002, that Plaintiff was on multiple pain medications to both prevent and treat her migraine headaches, as well as other medications for her fibromyalgia and chronic pain syndromes, and that Plaintiff could not work. (Tr. 672-76). Dr. Mays also reported that Plaintiff came to her appointments in a wheelchair, was unable to walk more than three to four minutes without exacerbating her pain, and that, other than supine, Plaintiff could not maintain any static position for more than a half-hour. *Id.* Dr. Mays opined Plaintiff's overall prognosis was extremely

14

poor, that her pain has been very chronic in nature and resistant to treatment despite the effort of numerous physicians, and that Plaintiff's pain would contribute to multiple absences from work. *Id.* Dr. Mays also opined that Plaintiff had poor attention and comprehension, probably due to her medications, that Plaintiff had been unable to perform any substantial gainful activity since October 2001, that she continued to be disabled, and that any degree of work would produce a relapse in Plaintiff . *Id.* Dr. Mays noted that Plaintiff's attention span would not allow her to take on new tasks or adjust well to changes within the work environment, and that Plaintiff would not be able to work, even part-time, which would involve working 4-6 hours per day. *Id.*

On January 14, 2004, Dr. Clark noted that she had seen Plaintiff 36 times over the previous 15 months. (Tr. 697-99). Dr. Clark also noted Plaintiff had severe symptoms of depression and anxiety and she identified Plaintiff's diagnoses as major depressive disorder, recurrent, severe, generalized anxiety disorder, and a previously diagnosed panic disorder. *Id.* Dr. Clark further noted that initial progress was slow and Plaintiff had difficulty remembering assignments or how to do them. *Id.*

On February 4, 2004, examining psychiatrist Dr. Bienenfeld reported that Plaintiff fidgeted moderately throughout the examination, was frequently in tears and only made fair eye contact, had a depressed mood, and that she was anxious. (Tr. 781-96)*.* Dr. Bienenfeld also reported that Plaintiff was alert and cooperative, had very little range of emotional display, and that her test scores were in the severe range for both anxiety and depression. *Id.* Dr. Bienenfeld noted that Plaintiff's diagnoses were major depression, recurrent, and severe without psychosis, generalized anxiety disorder, and a pain disorder and he assigned Plaintiff a GAF of 45. *Id.* Dr. Bienenfeld opined that the combination of Plaintiff's depression and anxiety with her physical impairments

15

would make ordinary work activity "out of the question" and that Plaintiff had poor or no ability to perform most work-related mental activities. *Id.*

On February 16, 2004, Dr. Covington, a pain management specialist at the Cleveland Clinic evaluated Plaintiff and reported that her mental status evaluation revealed blunted affect and somatic preoccupation. (Tr. 797-99). Dr. Covington also reported that Plaintiff was alert and cooperative, that her speech was normal, and that her attention and concentration were normal. *Id.* Dr. Covington noted that Plaintiff was oriented and that her insight and judgment were good. *Id.* Dr. Covington opined that Plaintiff's diagnoses were somatoform pain disorder, transformed migraines, cervicalgia, mild lumbar degenerative disc disease, fibromyalgia, rule our somatization disorder, and pain disorder with mixed medical and psychological features. *Id.* Dr. Covington also opined that psychogenic components to Plaintiff's complaints and impairment were strongly suggested by her nonphysiologic examinations and her inordinate functional impairment. *Id.*

Plaintiff continued to treat with Dr. Mays who noted on August 30, 2004, that Plaintiff reported that she was experiencing severe headaches a couple of times a week, and that with Botox she had a five to six week span where she had no headaches. (Tr. 816).

The medical advisor (MA) testified that Plaintiff's orthopedic impairments did not meet or equal any listings and that Plaintiff was able to perform sedentary work. (Tr. 911-919). The MA also testified that he was able to opine regarding Plaintiff's upper and lower extremity strength, but that he would defer to Dr. Mays regarding neurological problems. *Id.*

In her Statement of Errors, Plaintiff alleges that the Commissioner erred by rejecting her treating physician's opinion, by rejecting her subjective complaints of pain, and by relying on the VE's testimony because it was in response to an improper hypothetical question.  (Doc. 8).

16

In support of her first Error, Plaintiff argues that the Commissioner erred by failing to give the proper evidentiary weight to treating physician Dr. Mays' opinion.

Essentially, this is a "pain case".  In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition.  *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247, (6th Cir. 2007).  Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain.  *Rogers, supra* (citations omitted).  First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  *Id.* (citation omitted).  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities, *Id.*  Stated differently, there is a two-step process for evaluating pain.  First, the individual must establish a medically determinable impairment which could reasonably be expected to produce the pain.  *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986).  Second, the intensity and persistence of the alleged pain are evaluated by considering all of the relevant evidence.  *See, Jones,* 945 F.2d at 1366-70.

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir.  2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)).  In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social*

17

*Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004).  "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502).  However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue.  *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986).  A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record.  *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

The reason for the "treating physician rule" is clear:  the treating physician has had a greater opportunity to examine and observe the patient.  *See, Walker v. Secretary of Health and Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992).  Further, as a result of his or her duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians.  *Id.* (citation omitted).

Plaintiff's complaints of chronic and disabling pain are supported by the evidence of record, particularly the findings and opinions of her treating physicians.

Dr. Mays of the neurology department at Cleveland Clinic has been Plaintiff's long-term treating physician.  Indeed, Dr. Mays has been treating Plaintiff since 2002 and continued to treat Plaintiff through at least the time of the administrative hearing.  Dr. Mays clinical notes are consistent in documenting Plaintiff's daily, intractable headaches.  *See, e.g.,* Tr. 528-31, 537-39, 554-56, 672-96, 755-80, 816-22.  In addition, to describing Plaintiff as one of "the worse cases of

18

headache and chronic pain" she had ever seen, Dr. Mays has consistently opined that Plaintiff is not able to work and is totally disabled. Further, in reaching that conclusion, Dr. Mays took into consideration the temporary relief that Plaintiff experienced after receiving Botox injections. Based on her long-term treating physician relationship with Plaintiff, Dr. Mays also concluded that Plaintiff had poor attention and comprehension and would have numerous absences from work as a result of her headaches and other pain.

Dr. Mays' opinion is consistent with other physician-provided evidence of record. For example, long-term treating physician Dr. Whitmer, who has treated Plaintiff since 1997, noted that Plaintiff's headaches had become a "significant detriment to her life" and he opined that Plaintiff was totally disabled. In addition, psychiatrist Dr. Bienenfeld opined that Plaintiff had poor to no ability to perform work-related mental activities, a conclusion which Dr. Mays also reached.

In addition to the opinions of the treating physicians, Plaintiff's allegations of disabling pain are supported by other evidence. Specifically, Plaintiff's complaints of disabling pain have been consistent over time. Additionally, Plaintiff requires prescription medications for relief of pain, *see,* Tr. 142, some of which, as Dr. Mays reported, affect her cognitive functioning.

Under these facts, this Court concludes that the Commissioner erred by rejecting treating physician Dr. Mays' opinion that Plaintiff is disabled by her pain. In addition, the Commissioner erred by rejecting Plaintiff's subjective complaints and allegations of disabling pain. Therefore, the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence on the record as a whole.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits

granted.  The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994)(citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

This Court concludes that all of the factual issues have been resolved and that the record adequately establishes Plaintiff's entitlement to benefits. Specifically, as noted above, Plaintiff's long-term treating physicians Drs. Mays and Whitmer have essentially opined that Plaintiff is not capable of performing substantial gainful activity.  In addition, Plaintiff's allegations of disabling pain are supported by those opinions as well as by the other evidence of record. Accordingly, the Commissioner's decision that Plaintiff is not disabled should be reversed.

It is therefore recommended that the Commissioner's decision that Plaintiff is not disabled and therefore not entitled to benefits under the Act be reversed.  It is further recommended that this matter be remanded to the Commissioner for the payment of benefits consistent with the Act.

June 13, 2008.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

J:\Social Security - Drafts\Lindamood_SSD.wpd

## NOTICE  REGARDING  OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), ( C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).